UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
CHRISTOPHER ROSS,                    :
                    Plaintiff,       :
                                     :
     -v-                             :     10 Civ. 3937 (DLC)
                                     :
WESTCHESTER COUNTY,                  :     OPINION & ORDER
                                     :
                    Defendant.       :
                                     :
------------------------------------ X

APPEARANCES:

For plaintiff:

Christopher Ross, pro se
95-A-8093
Greene Correctional Facility
P. O. Box 975
Coxsackie, NY 12051-0975

For defendant:

Robert F. Meehan
Christine Lynne D'Alessio
Westchester County Attorney's Office
148 Martine Avenue
White Plains, NY 10601


DENISE COTE, District Judge:

     Plaintiff Christopher Ross ("Ross"), proceeding pro se,

filed this action pursuant to 42 U.S.C. § 1983 for injunctive

relief and to recover compensatory damages for a series of

alleged constitutional violations that he suffered in connection

with his medical treatment while incarcerated at the Westchester

1

County Department of Correction ("WCDOC") between August 14, 2009 and August 3, 2010.  Following a motion to dismiss, the action currently consists of one claim against defendant Westchester County ("County"), alleging that the County acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  On October 10, 2012, the County filed a motion for summary judgment.  For the following reasons, the defendant's motion is granted.

BACKGROUND

The following facts are undisputed and taken in the light most favorable to the plaintiff unless otherwise indicated.  On August 14, 2009, Ross was admitted to the WCDOC.  Upon his admission, Nurse Practitioner Dorthy Day ("Day") conducted a medical intake examination, during which Ross informed Day that he had recently been released from Greenwich Hospital and suffered from cardiomyopathy, high blood pressure, hypertension, and sleep apnea.  Ross explained that he had had a catheterization procedure to inspect the left side of his heart for blockage because he had cognitive heart failure, and provided the medical staff with a list of prescribed medications.  According to Ross, Day inquired as to whether Ross used a continuous positive airway pressure machine ("CPAP") for

2

his sleep apnea and whether he had brought it with him to the prison.  CPAP is a type of therapy that uses a machine to help a person with obstructive sleep apnea breath more easily during his sleep.[1]  Ross informed her that he did use a CPAP machine at home when he slept, but that he did not have his machine at the WCDOC.  Ross testified that he did not specifically request a CPAP machine during his medical intake.

According to WCDOC procedure at the time of Ross's incarceration, an inmate could only use a CPAP machine while housed in WCDOC's Infirmary.  On the August 14 intake examination form, Day reported that "Inmate [Ross] refuses to go to I[nfirmary] Block and use our C-PAP machine states he will be fine."  Ross, however, testified that no one at the WCDOC offered to provide him with a CPAP machine or explained that he could only use a CPAP machine in the Infirmary.  Ross was placed in general population housing.

On August 24, Ross was referred to a chronic care physician, Dr. Randy Goldberg ("Goldberg"), for his hypertension.  Dr. Goldberg examined Ross and reviewed Ross's medical history and medications, including that Ross has sleep

---

[1]  A CPAP machine increases air pressure in the throat so that the airway does not collapse when the individual breathes in. It consists of a mask attached to a machine and is typically worn only while sleeping.  A CPAP machine is set to a particular pressure level, measured in centimeters of water (cm H2O), that regulates air pressure during an individual's inhalation.

apnea.  Dr. Goldberg's notes from August 24 indicate that Ross felt "[r]easonably well" that day.

Ross was seen by Dr. Goldberg and Dr. Gary Guo ("Guo") on multiple occasions in the following months in connection with his ongoing chronic medical issues, including hypertension, cardiomyopathy, and high blood pressure.  Medical Progress Notes on these dates provide some insight into how Ross described his condition to WCDOC medical staff at the time: the Progress Notes indicate Ross was "all right" on October 7; "all right" on October 20; "[b]asically well" on November 4; "okay" on November 18; and "feels well" on November 30.  Ross, however, testified that he complained to medical staff at the WCDOC throughout those months about his sleep apnea and access to a CPAP machine. Ross also testified that he did not believe he could ask for a CPAP machine during his medical examinations with Drs. Goldberg and Guo because those visits were intended only to check his vitals and ensure his medications were stable.

Ross filed a Sick Call Request form on September 28 seeking dental care related to a broken tooth.  He saw a dentist on September 30.  Ross claims that he mentioned his sleep apnea to the dentist but did not specifically request a CPAP machine during that visit because he did not believe a dentist was the appropriate doctor to ask for treatment unrelated to his teeth.

4

Ross was moved to the Special Housing Unit ("SHU") from general population on November 20 as a result of a disciplinary infraction.  Ross was uncomfortable sleeping on a "concrete slab" while in the SHU and experienced difficulty breathing while sleeping.  He spoke to a nurse about a CPAP machine upon his arrival in the SHU.

On December 5, Ross filed a grievance ("December 2009 Grievance") requesting a CPAP machine for his sleep apnea. Later that day, he was examined by a Nurse Practitioner and referred to Dr. Goldberg.  That day, the WCDOC medical staff also obtained a release from Ross to access his medical records, and contacted Ross's former doctor, Dr. Yung, hoping to obtain Ross's past medical records with respect to his use of a CPAP machine, including the results of a 2006 sleep study that Ross took.[2]

On December 7, Ross reported symptoms of sleep apnea, including "poor sleep" and "gurgling and choking" at night.  He was examined by Dr. Goldberg that day and transferred to the Infirmary where he was given access to a bi-level positive

---

[2] It appears that Drs. Goldberg and Guo attempted to contact Dr. Yung and receive Ross's records on several occasions on and after December 5.  It is not clear from the record that Dr. Yung ever responded to either doctor.

airway pressure machine ("Bi-PAP").[3]  Dr. Goldberg prescribed the
setting for the machine at "I 10" for inhalation and "E 5" for
exhalation.  On December 8, Ross's December 2009 Grievance was
rejected as unfounded.

Ross testified that he used the Bi-PAP machine every day.
There is no dispute that the machine was in working condition
and was regularly monitored.  Nurses in the Infirmary monitored
Ross and his use of the Bi-PAP machine, and reported that he
used the machine at night and "slept well through the night
using the CPAP machine."  At times, several nurses recorded
during their rounds that Ross was only using his Bi-PAP machine
intermittently, while others reported that Ross was "using C-PAP
machine at all times during the night while asleep."[4]

The WCDOC medical staff "replaced and fitted" the headband
to Ross's Bi-PAP mask on January 2, 2010, after Ross had

---

[3] A Bi-PAP machine serves a similar function to a CPAP machine,
but whereas a CPAP provides only one pressure setting, a Bi-PAP
provides two pressure settings: one for inhalation and one for
exhalation.  The dual settings aid breathing comfort by allowing
an individual to exhale against a lower air pressure.  The terms
CPAP and Bi-PAP are used interchangeably in the WCDOC medical
staff records and are used interchangeably in this Opinion, as
well.

[4] Nurses in the Infirmary documented occasions when Ross did not
use the CPAP machine -- referred to as occasions of
"non-compliance" -- including four days in January 2010, four
days in February 2010, and four days in March 2010.  Ross
testified that at times he would pull the Bi-PAP mask off in his
sleep because he was experiencing discomfort due to the improper
calibration of the machine.

complained that the machine was "choking" him.  The medical records from that day report that Ross "confirms good seal to mask."  On January 30, the medical staff replaced Ross's mask a second time, after Ross had requested a mask in a smaller size. Ross testified that he complained nearly every day to "every nurse and doctor [he] could find" that the Bi-PAP machine was incorrectly calibrated.  WCDOC medical staff, however, frequently noted that Ross "slept well" and had "no complaints" for the nurses during their rounds around that time.

On March 18, Ross filed a grievance stating that he was experiencing "extreme difficulties breathing and sleeping at night" ("March 2010 Grievance").  Ross claimed that the Bi-PAP machine was outdated, the pressure setting was not working properly, and that his mask was too tight.  Ross's grievance was denied.

On April 2, Ross told a nurse that he did not feel comfortable with the two sizes of masks he had been given for the Bi-PAP machine.  The nurse suggested that Ross ask his family to bring his own mask to him, since it had been custom fit.  It is unclear from the record whether Ross ever received his mask from home or if he continued to use a mask that the WCDOC staff provided.

On June 16, Ross again complained about the settings on the Bi-PAP machine.  WCDOC medical staff attempted to reach Dr. Yung for "background information," but received no response,[5] and a member of the WCDOC medical staff from "respiratory" adjusted Ross's Bi-PAP machine to its "former setting."  On June 19, a nurse reported that Ross's Bi-PAP was "at [his] bedside" and "there ha[ve] been no complaints [from Ross] with the adjustment made three days ago."

On June 26, Ross complained that his CPAP was not working properly.  An Infirmary nurse noted that they were still waiting for Dr. Yung to send over Ross's "numbers."  On June 29, Ross was seen by Dr. Guo, who set his Bi-PAP machine to "I[]6" and "E[]4."

On February 13, 2012, Ross participated in a new sleep study diagnostic test for his sleep apnea at the Mount Vernon

---

[5] Both the County and Ross have provided as evidence an undated page of notes from a conversation held between WCDOC nurse Maria Nestro and an individual named Anthony at the sleep study department of Westchester Medical Center discussing the results of Ross's 2006 sleep study.  Fax cover sheets also presented in evidence indicate that the conversation occurred around June 6, 2010.  The notes indicate that Anthony told Nestro that a prescription for Ross's CPAP was "11 cm H2O" and that Ross was last seen in August of 2006.  Anthony suggested that Nestro call Dr. Yung since he was the last doctor at the White Plains Hospital to see Ross as a patient.  The medical records from June 16 indicate that the nurse asked Ross to speak to Dr. Yung's office at White Plains Hospital since she "did not know the question that needed to be asked -- unfamiliar with the terminology of CPAP."  Dr. Yung did not call back.

Hospital.[6]  The 2012 sleep study found that Ross's "[s]leep architecture was abnormal (fragmented) and improved with effective CPAP" and that Ross had a "severely elevated" Apnea Hypopnea Index, which was based on the number of obstructive apneas he experienced throughout the course of the study.  Other aspects of Ross's tests were considered "normal."  It also found that Ross "responded well" to a CPAP pressure set at 15 cm H2O.  The sleep study ultimately concluded that Ross suffered from "Severe Obstructive Sleep Apnea Syndrome," and recommended inter alia that Ross be treated with "nasal CPAP therapy at a pressure of 15 cm H2O whenever asleep."

PROCEDURAL HISTORY

Ross commenced this lawsuit on May 12, 2010.  Ross filed an amended complaint against Westchester County and several other individual defendants on February 24, 2011.  Defendants moved to dismiss the suit on June 6, 2011.  By Opinion and Order dated January 11, 2012, the Court granted the motion to dismiss with respect to all of Ross's claims except his claim against the County for deliberate indifference to serious medical needs based on the failure to provide him with a CPAP machine for

---

[6] As described below, on January 11, 2012, the plaintiff's claims regarding the denial of access to a CPAP machine and the subsequent improper adjustment of his Bi-PAP machine survived a motion to dismiss.

several months after arriving at the WCDOC and the alleged
improper calibration of the Bi-PAP machine he received on
December 7, 2009.  <u>Ross v. Westchester Cnty. Jail</u>, No. 10 Civ.
3937 (DLC), 2012 WL 86467, at *10 (S.D.N.Y. Jan. 11, 2012).  On
October 10, 2012, after the close of fact discovery, the County
filed a motion for summary judgment pursuant to Rule 56, Fed. R.
Civ. P., and served Ross with a "Notice to Pro Se Litigant Who
Opposes a Motion for Summary Judgment" pursuant to Local Rule
56.1.  After an extension, Ross filed his opposition, and the
County then filed its reply.

DISCUSSION

The County has moved for summary judgment on the
plaintiff's remaining claim regarding the treatment Ross
received for his sleep apnea.  Summary judgment may not be
granted unless all of the submissions taken together "show[]
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Rule 56(a),
Fed. R. Civ. P.  The moving party bears the burden of
demonstrating the absence of a material factual question, and in
making this determination, the court must view all facts in the
light most favorable to the non-moving party.  <u>Eastman Kodak Co.
v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992);

10

Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and
cannot "rely merely on allegations or denials" contained in the
pleadings.  Rule 56(e), Fed. R. Civ. P.; see also Wright v.
Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely
on mere speculation or conjecture as to the true nature of the
facts to overcome a motion for summary judgment," as "[m]ere
conclusory allegations or denials cannot by themselves create a
genuine issue of material fact where none would otherwise
exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)
(citation omitted).  Only disputes over material facts -- "facts
that might affect the outcome of the suit under the governing
law" -- will properly preclude the entry of summary judgment.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In considering the summary judgment motion, the Court
liberally construes all submissions by the pro se plaintiff and
"interpret[s] [them] to raise the strongest arguments that they
suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,
474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).
The application of this forgiving standard for pro se litigants,
however, "does not relieve plaintiff of his duty to meet the

11

requirements necessary to defeat a motion for summary judgment."
Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)
(citation omitted).

To sustain claims under 42 U.S.C. § 1983, the plaintiff
must show that he was "deprived of rights, privileges, or
immunities secured by the Constitution and laws [of the United
States]" by a person acting under color of state law.  Burg v.
Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted); see
also Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 119 (2d Cir.
1995) ("Section 1983 is only a grant of a right of action; the
substantive right giving rise to the action must come from
another source.").  Therefore, "the first step in any § 1983
claim is to identify the specific constitutional right allegedly
infringed."  Pabon v. Wright, 459 F.3d 241, 252–53 (2d Cir.
2006) (citation omitted).  In addition, while § 1983 "imposes
liability on a government that, under color of some official
policy, causes an employee to violate another's constitutional
rights," Okin v. Village of Cornwall-on-Hudson Police Dep't.,
577 F.3d 415, 439 (2d Cir. 2009) (quoting Monell v. Dep't of
Soc. Servs., 436 U.S. 658, 692 (1978)), a municipal entity is
not subject to respondeat superior liability under § 1983.
Monell, 436 U.S. at 691.  Instead, "[t]o prevail against a
municipality on a § 1983 claim, a plaintiff must demonstrate

both an injury to a constitutionally protected right and that the injury was caused by a policy or custom of the municipality or by a municipal official responsible for establishing final policy." Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008).

Ross principally argues that the County acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment on two occasions: (1) between August 14 and December 7, 2009, by failing to provide him with a CPAP or Bi-PAP machine to treat his sleep apnea, and (2) after December 7, 2009, by failing to adjust his Bi-PAP machine to the correct setting.  The defendant contends that it is entitled to summary judgment in its favor because Ross has failed to offer any evidence demonstrating either that the County was deliberately indifferent to Ross's medical needs or that any such violation was caused by a municipal policy or custom.

A.   Eighth Amendment Violation

"There are two elements to a claim of deliberate indifference to a serious medical condition: [t]he plaintiff must show that [he] had a serious medical condition and that it was met with deliberate indifference." Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) (citation omitted); see also Hill v. Curcione, 657 F.3d 116, 122-23 (2d Cir. 2011).  Deliberate indifference is a mental state akin to "recklessness," and is

13

measured using a "subjective test" that discerns whether the
defendant was "actually aware of an excessive risk to an
inmate's health or safety," Caiozzo, 581 F.3d at 69, and
therefore "act[ed] with a sufficiently culpable state of mind."
Hill, 657 F.3d at 122 (citation omitted).

A prison official only has a "duty . . . to provide
reasonable care."  Salahuddin v. Goord, 467 F.3d 263, 279 (2d
Cir. 2006).  Accordingly, an inmate is not entitled to treatment
by every available medical alternative as long as his treatment
is reasonable.  Estelle v. Gamble, 429 U.S. 97, 107 (1976).
Furthermore, a "mere disagreement over the proper treatment does
not create a constitutional claim.  So long as the treatment
given is adequate, the fact that a prisoner might prefer a
different treatment does not give rise to an Eighth Amendment
violation."  Hill, 657 F.3d at 123 (citation omitted).

With respect to the seriousness of a plaintiff's condition,
when the challenged conduct is the deprivation of medical care
for a period of time, "it is appropriate to focus on the
challenged delay or interruption in treatment rather than the
prisoner's underlying medical condition alone in analyzing
whether the alleged deprivation is, in objective terms,
sufficiently serious to support an Eighth Amendment claim."
Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (citation

14

omitted).  Other factors relevant to the seriousness of a
medical condition include "the existence of an injury that a
reasonable doctor or patient would find important and worthy of
comment or treatment" and "the presence of a medical condition
that significantly affects an individual's daily activities."
Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citation
omitted).

With respect to Ross's claim that the County failed to
treat his sleep apnea for over three months after he was
admitted to WCDOC, Ross principally argues that after he
"explained his medical record" to the WCDOC medical staff, "they
put [him] in general population and no one ever followed up."
It is undisputed that Ross told the intake nurse on August 14
that he had sleep apnea, and that he was not provided with a
CPAP machine from the time of his arrival until December 7,
2009.  Ross also testified that his condition causes him to stop
breathing, "choke," and "gurgle" while he sleeps.  Ross
testified that he experienced these symptoms while housed in
general population.  It is also not disputed that once Ross
underwent a sleep study in February 2012, he was diagnosed with
"severe" sleep apnea, and it was recommended that he be
"treat[ed] with nasal CPAP therapy at a pressure of 15 cm H2O
whenever asleep" to treat his condition.

The County contends that the evidence demonstrates that the WCDOC provided Ross with thorough care throughout his incarceration, never denied him access to a CPAP machine, and that Ross actually refused a CPAP machine when one was offered to him.  The County emphasizes that Ross did not request a CPAP machine until he was confined in SHU, and the use of a CPAP machine would require him to be released from SHU to the Infirmary.  Finally, the County points out that as soon as Ross filed a grievance requesting a CPAP machine, he was promptly examined and within two days moved to the Infirmary and given a Bi-PAP machine.  The County's evidence, however, does no more than raise issues of fact to be resolved at a trial regarding its deliberate indifference.

While Day's intake report states that Ross "refused" to be housed at the Infirmary with a CPAP machine, Ross contends that he was never offered a CPAP machine upon intake or in the following months, and that he was initially "put" into general population housing instead of the Infirmary.  It is also not clear that WCDOC medical staff ever explained to Ross that he needed to be housed in the Infirmary in order to receive access to a CPAP machine.  Moreover, the fact that Ross was seen by Drs. Goldberg and Guo for his chronic care conditions on various occasions on August 24, 2009 and after, does not establish that

Ross also received appropriate medical attention with respect to his sleep apnea for the first three months of his incarceration.

This record is sufficient to raise a material question of fact as to the County's deliberate indifference to treating Ross's sleep apnea between August 14 and December 7, 2009.  The record makes clear that WCDOC medical staff was informed of his serious medical condition when he arrived at the hospital on August 14, 2009, but did not provide him with the device that allows him to breathe while sleeping until nearly four months later.  It is not clear from the record that this response, for any length of time, was a "reasonable" or "adequate" manner to treat the plaintiff's condition.

By contrast, Ross has not successfully raised a question of fact sufficient to withstand summary judgment regarding the County's response to his complaints about adjusting his Bi-PAP settings after he was moved to the Infirmary and provided with a machine on December 7, 2009.  Ross contends that the WCDOC medical staff did not set his Bi-PAP machine properly, and that doctors did not run the tests necessary to determine a proper calibration to treat his sleep apnea effectively.[7]

_____

[7] The Court has already dismissed Ross's claims regarding the specific tests doctors at the WCDOC used to test his sleep apnea, finding that this claim constituted a mere disagreement with a course of treatment, which failed to state a claim.  See Ross, 2012 WL 86467, at *6.

The parties do not dispute that Ross complained about the settings on his Bi-PAP machine.  But Ross also does not dispute that, after he complained about experiencing discomfort using his Bi-PAP machine, the WCDOC medical staff changed his mask on two occasions, and adjusted the settings on his Bi-PAP machine at least twice.[8]  It is also undisputed that the WCDOC medical staff attempted to contact Dr. Yung on several occasions between December 2009 and July 2010 for background information on Ross's condition and to ascertain the CPAP settings previously prescribed for Ross, but that Dr. Yung did not respond.  While Nestro may have spoken to an individual at Westchester Medical Center about Ross, it is not disputed that, despite their efforts, the WCDOC medical staff could not retrieve Ross's 2006 CPAP prescription from his former treating physician.

---

[8] While Ross points to the fact that the "I 10/E 5" and "I 6/E 4" settings applied by the medical staff at the WCDOC were not the same as the 11 cm H2O CPAP setting that had been reported to Nestro by the Westchester Medical Center in early June 2009, the record does not indicate how an "I 10/E 5" or "I 6/E 4" Bi-PAP setting relates to either an 11 cm H2O or the 15 cm H2O CPAP setting prescribed during his February 2012 sleep study.  In any event, whether the prescription that Anthony reported to Nestro in June 2010 was similar to or different from the levels to which Ross's Bi-PAP machine was set at the WCDOC is of no consequence.  The 11 cm H2O CPAP setting prescribed in Ross's 2006 sleep study was not the same as the 15 cm H2O CPAP setting determined to be appropriate for Ross in his 2012 sleep study, and nothing in the record demonstrates that the Bi-PAP settings utilized by Dr. Goldberg or other members of the WCDOC medical staff who adjusted Ross's Bi-PAP machine were medically improper or unreasonable.

Accordingly, Ross's claim of deliberate indifference based on the County's failure properly to adjust the settings on his Bi-PAP machine after December 7, 2009, is dismissed.

B.   Municipal Policy or Custom

Having determined that a material question of fact exists as to whether the WCDOC medical staff's failure to treat Ross's sleep apnea for over three months violated the plaintiff's Eighth Amendment rights, Ross's claim against the County will only survive summary judgment if Ross has also demonstrated that a municipal "policy or custom" caused that violation.  Hartline, 546 F.3d at 103.  Ross has not made that showing.

Ross principally argues that the County medical staff does not have an adequate system to identify prisoners with medical needs and make sure they are properly treated, and asks the Court to infer a municipal policy from the WCDOC's handling of his individual case.  Municipal liability may spring from a single incident in certain circumstances.  See Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 125 (2d Cir. 2004).  Where a plaintiff alleges that his rights were deprived by a "single tortious decision or course of action, the inquiry focuses on whether the actions . . . may be said to represent the conscious choices of the municipality itself."  Id. at 126.  This is because "[t]he 'official policy' requirement was intended to

distinguish acts of the municipality from acts of employees of
the municipality, and thereby make clear that municipal
liability is limited to action for which the municipality is
actually responsible." Pembaur v. City of Cincinnati, 475 U.S.
469, 479 (1986).  As a result, a plaintiff must prove that the
alleged deprivation "occurred as a result of a [municipal]
policy rather than as a result of isolated misconduct by a
single actor." Reynolds v. Giuliani, 506 F.3d 183, 207 (2d Cir.
2007) (citation omitted); see also City of Oklahoma City v.
Tuttle, 471 U.S. 808, 823-24 (1985) ("[p]roof of a single
incident of unconstitutional activity is not sufficient to
impose liability under Monell, unless proof of the incident
includes proof that it was caused by an . . . unconstitutional
municipal policy," or that such a "policy was attributable to a
municipal policymaker.").  To do so, the plaintiff must identify
a municipal policy as "the moving force" that "actually caused"
the constitutional violation. Connick v. Thompson, 131 S.Ct.
1350, 1358 n.5 (2011) (citation omitted); see Reynolds, 506 F.3d
at 207.  "Monell's policy or custom requirement is satisfied
where a local government is faced with a pattern of misconduct
and does nothing, compelling the conclusion that the local
government has acquiesced in or tacitly authorized its
subordinates' unlawful actions." Reynolds, 506 F.3d at 192.

Ross has not established that any County custom or policy caused the WCDOC medical staff's delay in providing him with a CPAP machine.  While Ross attempts to argue that the failure of the WCDOC "to follow up" with his sleep apnea is evidence of a flawed system that routinely fails to identify and treat prisoners, he does not point to a single other instance of similar treatment -- and certainly not to repeated examples of such treatment -- in order to support a finding that a "pattern of misconduct" amounting to deliberate indifference to prisoners' medical needs existed in the County.  Id.; see also Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).  Instead, the evidence shows that Ross received frequent medical consultations to treat his chronic care conditions; when Ross utilized the WCDOC's sick call procedure for a broken tooth, he received dental treatment promptly; when Ross filed a formal grievance complaining about his medical care on December 5, he was referred to a doctor and provided with a Bi-PAP machine within days; and when he complained to a nurse on June 26 about his Bi-PAP machine, Dr. Guo adjusted the settings on his machine soon after.  As a result, no reasonable jury could find that "systematic deficiencies in staffing, facilities or procedures" made Ross's experience "inevitable."  Todaro, 565 F.2d at 52.[9]

---

[9] Ross's reliance on a 2009 Department of Justice report that

Ross also fails to establish that any constitutional violation was caused by the actions or omissions of any individual with policy-making authority for the County.  There is no evidence suggesting that a County policymaker had notice of any delay in the provision of medical treatment to Ross or other prisoners, let alone that a policymaker in any way ordered, encouraged, or ignored such conduct.  See Amnesty, 361 F.3d at 125-26.  Ross testified that he wrote letters and complained to "everybody inside . . . [and] outside the jail" while housed in general population that he had not received a CPAP machine to treat his sleep apnea.[10]  But Ross does not identify the individuals to whom or the dates on which he wrote, much less provide evidence of any such letters or complaints in opposing this motion for summary judgment.[11]  Nor does Ross

---

detailed the findings of an investigation into conditions at the Westchester County Jail is unpersuasive.  Ross does not provide the report in evidence, and in any event, the report did not find systematic problems with respect to the issues raised in this case.  Insofar as the report describes any deficiencies in the medical grievance process at the Westchester County Jail, it refers only to inmates' ability to obtain grievance forms.  Ross does not challenge his access to grievance forms, and it is clear that Ross both had access to and used grievance forms on a number of occasions while incarcerated.

[10] Ross testified, for example, that he wrote a letter to the President of the United States complaining about his medical treatment while housed in general population.

[11] The only written records of Ross's complaints about his access to a CPAP machine submitted to the Court in conjunction with this motion for summary judgment are Ross's December 2009

present evidence indicating that any individual within the WCDOC who knew of, or heard a complaint about, his sleep apnea had policy-making authority; or that a policymaker outside of the jail was ever aware of any such complaint.  Ross also fails to raise a question of fact as to whether the need for corrective action or supervision was or should have been otherwise "obvious" to the County, or whether any individual -- let alone a policymaker -- failed to investigate or resolve Ross's situation as a result of a "deliberate choice" indicating indifference, see Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011), rather than "mere negligence or bureaucratic inaction."  Amnesty, 361 F.3d at 128.

In sum, there is not sufficient evidence in the record for a jury reasonably to infer that a policy, custom, or practice, or the deliberate choice of any County policymaker, caused the WCDOC's failure to provide Ross with treatment for his sleep apnea for over three months.  Ross's claim of deliberate indifference against the County is therefore dismissed.

---

Grievance and March 2010 Grievance, both of which were addressed promptly.

CONCLUSION

The defendant's October 10, 2012, motion for summary judgment is granted.  The Clerk of Court shall enter judgment for the defendant and close this case.

SO ORDERED:

Dated:     New York, New York
           September 16, 2013

_____
                      DENISE COTE
           United States District Judge

Copies mailed to:


Christopher Ross
#95-A-8093
Greene Correctional Facility
P.O. Box 975
Coxsackie, NY 12051-0975